Filed 1/13/15  In re Kaelyn L. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re KAELYN L. et al., Persons Coming Under the Juvenile Court Law. | B256977 (Los Angeles County Super. Ct. No. CK82037) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MARK L., <br><br> Defendant and Appellant. | |

APPEAL from an order and a judgment of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

Nancy O. Flores, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mark L. (father) appeals from a juvenile court judgment terminating his parental rights to one of his daughters, Kaelyn L. (Kaelyn, born Feb. 2002), and the juvenile court's order denying his petition seeking placement or, in the alternative, further reunification services with Kaelyn and another one of his daughters, M.L. (M., born Feb. 2004). (Welf. & Inst. Code, §§ 366.26, 388.)[1] He contends that his parental rights to Kaelyn should not have been terminated because (1) he maintained consistent visitation with Kaelyn and she would benefit from continuing the relationship (§ 366.26, subd. (c)(1)(B)(i)), and (2) there is a sibling bond between Kaelyn and her sisters (§ 366.26, subd. (c)(1)(B)(v)). Regarding the section 388 petition, father argues that the juvenile court's order was based on "fictitious evidence."

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention*

Father and Guadalupe O. (mother) are the biological parents of Melissa L. (born Aug. 1997), Kaelyn, and M. The children also have a half-sister, Kelly O. (Kelly, born Apr. 2010).

This family came to the attention of DCFS when mother and Kelly tested positive for methamphetamine at Kelly's birth. Mother was interviewed and stated that Melissa, Kaelyn, and M. were residing with their paternal grandfather because of mother's drug use. Mother also reported that father had gone to prison after he broke her jaw in September 2008. And, mother indicated that father used drugs when they were living together, although she denied that they used drugs together.

DCFS learned that father had a lengthy criminal history, beginning in 1994, when he was a minor. In 2002, he was convicted of misdemeanor infliction of corporal injury on a spouse. In 2005, he was convicted of misdemeanor threat of crime with the intent to terrorize. In 2008, he was convicted of infliction of corporal injury on a spouse and

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

sentenced to four years in prison, where he was located when this dependency case was initiated. Father reported an expected release date in February 2012.

After conducting a team decision-making meeting, DCFS filed a section 300 petition on behalf of the children, alleging, inter alia, (1) violent altercations between mother and father, (2) father's history of illicit drug use, and (3) father's failure to provide the girls with the necessities of life. The children were detained with their paternal grandfather.

*Jurisdiction/Disposition Report*

DCFS reported that father was at Centinela State Prison. It also advised the juvenile court that the girls had been removed from their paternal grandfather's home due to allegations of physical abuse and neglect.

Interviews with the Children

Melissa disclosed that father was always fighting with mother. She knew that father was in prison because he had hit mother on her face when mother was coming out of the shower. Melissa called the police because she wanted father to stop. She said, "'I wasn't going to let him hurt her and one of them dies. I wanted them to stop.'" She also said that mother had to go to the hospital after father hurt her.

Kaelyn also remembered that father hit mother when she got out of the shower. She said that it was scary and that she "'was scared he would hurt her or do something bad to her.'"

M. too said that mother and father fought.

Interview of Father

Father admitted striking mother, but denied that the children were present at the time. He also denied being a drug addict, but he admitted that he had previously tried every drug. Later, he denied using "every" drug, but admitted to trying marijuana and alcohol. He denied knowledge of mother's substance abuse.

*Jurisdiction Hearing*

Father declined to be transported from state prison for the June 8, 2010, hearing. At the hearing, the juvenile court sustained the allegations of domestic violence and

3

substance abuse by mother and father pursuant to section 300, subdivision (b). It declared the children dependents of the court and ordered them removed from parental custody.

*Disposition Hearing*

Again, father chose to remain at prison rather than attend the July 15, 2010, disposition hearing. The juvenile court granted father reunification services and ordered him as follows: "Counseling at/with DCFS APPROVED COUNSELOR shall include: [¶] Other Counseling: DOMESTIC VIOLENCE GROUP COUNSELING FOR PERPETRATORS (52 WEEKS)." He was granted weekly monitored visits with the girls after his release from prison and one five-minute telephone call with the children at DCFS's expense while he remained in custody.

*Interim Review Report*

On September 7, 2010, DCFS reported that the girls had been placed with their maternal aunt, Vivian V. (Vivian).

DCFS reported that it had learned from the prison that it did not provide domestic violence counseling. It also found out that inmates had to earn telephone privileges and that father would have to earn his telephone privileges and then place his name on a list.

Vivian agreed to allow father to call the girls.

Father routinely wrote letters to the girls, who were excited to receive the letters.

*Status Review Report and Six-month Status Review Hearing*

On November 30, 2010, DCFS reported that the girls were still placed with Vivian. But, due to financial constraints, she would not be able to care for them on a long-term basis.

The social worker received information from father's prison that he was allowed to make collect telephone calls. However, to date, the social worker had not received any calls from father to set up times for his telephone calls to the girls. Furthermore, although there were no domestic violence programs, the prison offered anger management courses and substance abuse counseling.

At the hearing, the juvenile court continued reunification services for father. The juvenile court noted that father's place of incarceration did not provide services for him to reunite with the girls.

*12-month Status Review Report and Hearing*

On May 31, 2011, DCFS reported that the children were now placed with another relative, Jennifer V. (Jennifer). The girls stated that they liked living there and did not want to leave the home. They were doing well in school and assessed as well-adjusted despite the traumatic events in their lives.

Father remained incarcerated. There had been no visits between the girls and father. Jennifer was willing to transport them to the prison for visits, but the girls were ambivalent about doing so. They remained in contact with father through letters.

DCFS recommended terminating father's reunification services.

Father waived his appearance for the 12-month status review hearing. At the July 7, 2011, hearing, the juvenile court terminated father's reunification services and set a section 366.26 hearing.

*Section 366.26 Report and Hearing*

On November 3, 2011, DCFS reported that father was still in custody. There were no reported concerns about the girls' physical and emotional health, and there were no developmental concerns. Adoption was the recommended permanent plan, but DCFS needed more time to complete a home study with Jennifer and her husband. Melissa and Kaelyn both stated that if they could not be returned to their parents' care, then they wanted to be adopted by Jennifer and her husband. M. said that she wanted to remain in long-term foster care if she could not be adopted.

Father appeared in court for the first time for the November 3, 2011, hearing, but he was still in custody. The hearing was continued.

*Supplemental Section 366.26 Report*

On March 1, 2012, DCFS reported that in February 2012, Jennifer contacted the social worker and advised her that she no longer wanted to pursue adoption because she was feeling overwhelmed. At a team decision-making meeting, it was decided that

Melissa and Kelly would remain with Jennifer and her husband under a plan of adoption, and that Kaelyn and M. would be placed in another home. DCFS requested that parental rights to Melissa and Kelly be terminated and asked that the matter be continued for Kaelyn and M.

*Supplemental Section 366.26 Report and Hearing*

On June 6, 2012, DCFS reported that Melissa had an after-court visit with father and that he pleaded with Melissa that Kaelyn and M. not be adopted and that the girls stay together. A paternal great-aunt, Annie F. (Annie), contacted DCFS and indicated that she was interested in becoming the girls' legal guardian. DCFS reported that if Annie's home were approved, then the permanent plan for the girls would become legal guardianship. DCFS requested a continuance of the hearing for Melissa, Kaelyn, and M.

At the hearing, DCFS was given discretion to place the girls in another home. DCFS was ordered to arrange a monitored visit between father and the girls upon his release from prison. The matter was continued again.

*Father's First Section 388 Petition*

On June 18, 2012, father filed a section 388 petition, requesting that the juvenile court change its prior orders of suitable placement for the girls, termination of his reunification services, and monitored visits. He alleged that circumstances had changed because he had been released from prison on June 12, 2012; he had completed an anger management program, parenting classes, and vocational courses for electrical construction and repair; and he had availed himself of a self-help program and a correspondence course. He further argued that it was in the girls' best interests to change the prior orders and the girls wanted to live with him. He sought unmonitored visitation and further reunification services; alternatively, he sought more frequent monitored visitation with DCFS discretion to liberalize.

DCFS responded to father's section 388 petition, noting that his place of incarceration did not provide services for him to reunite with the girls—the prison did not offer a domestic violence program. But, father had completed an eight-week course for

anger management and he had recently enrolled in a 52-week domestic violence program. And, father had submitted a negative drug test.

DCFS further noted that father had communicated with the children through letters while he was incarcerated and that he was having weekly monitored visits.

DCFS believed that it was premature to grant father unmonitored visits. It wanted more time to observe and assess the relationship between father and the children. Thus, DCFS recommended that the section 388 petition be denied and asked the juvenile court to set a progress hearing to address father's visitation.

*Supplemental Section 366.26 Report*

At the same time as its response to father's section 388 petition, DCFS also filed a supplemental section 366.26 report. Melissa, Kaelyn, and M. were now living with Annie. Although they were ambivalent about being adopted, Annie would only be able to receive financial assistance through adoption. DCFS initiated an adoptive home study and stated that the social worker would work with the girls regarding their ambivalence towards adoption. Adoption and legal guardianship were explained to Annie, and she was open to maintaining a relationship between the girls and their parents.

Melissa was happy living with Annie. She was happy with a plan of legal guardianship, but ideally she wanted to live with father. Kaelyn was also happy living with Annie and happy with a plan of legal guardianship. M. said it was fun living with Annie. She liked living with her aunt and sisters, and she liked visiting mother and father.

DCFS recommended that the matter be continued to allow the girls to adjust to their new home.

*Hearing on Father's First Section 388 Petition*

On July 30, 2012, the juvenile court noted that father had done really well. It found changed circumstances and that it was in the girls' best interests to have more contact with father. Thus, it ordered monitored visits at least three times a week for two hours each and, after a month of monitored visits and agreement by the girls' attorney, DCFS would have discretion to allow unmonitored visits.

7

The juvenile court continued the section 366.26 hearing.

*Father's Second Section 388 Petition*

On September 24, 2012, father filed a second section 388 petition, requesting unmonitored visits to include overnight visits.

The matter was set for a hearing on November 7, 2012.

*Supplemental Section 366.26 Report*

Meanwhile, on September 25, 2012, DCFS reported that the choice of a permanent plan was uncertain. Melissa wanted to be adopted, but she did not want to hurt father's feelings. Annie wanted to adopt the girls, but they remained ambivalent about it.

*Continued Hearing*

On September 25, 2012, DCFS agreed that father could have unmonitored visits with the girls as long as the visits occurred in a public place and away from the paternal grandfather's home.

Father's second section 388 petition was withdrawn, and the section 366.26 hearing was continued again.

*Supplemental Section 366.26 Report and Hearing*

On May 9, 2013, DCFS reported that Melissa was now certain that she wanted to be adopted and urged Annie to contacted the adoptions social worker to complete the adoption home study. Kaelyn and M. remained highly attached to father and Annie did not want to force them into adoption. DCFS recommended adoption for Melissa and legal guardianship for Kaelyn and M. It requested a 90-day continuance to complete the home study.

At the hearing, DCFS was ordered to make best efforts to obtain funds to help father obtain appropriate housing.

*Status Review Report*

DCFS reported that all three girls were attached to Annie. Legal guardianship was the identified permanent plan for M.

On July 10, 2013, Kaelyn told Annie that she wanted to be adopted. She told the social worker that she changed her mind about adoption because she knew that Annie

8

would always allow her to see father. She said that Annie was like a mother to her. DCFS proposed that adoption be the permanent plan for both Melissa and Kaelyn.

*Father's Third Section 388 Petition*

On August 30, 2013, father filed his third section 388 petition, but relating to Kaelyn and M. only. He alleged that he had obtained stable housing for himself and the girls and that he had been granted overnight visits with them on May 9, 2013.[2] He further alleged that he was employed, had completed parenting and anger management courses, and had completed 44 out of 52 of his domestic violence classes. He asked the juvenile court to return Kaelyn and M. to his custody or, in the alternative, order further reunification services. He also alleged that he had daily visits with the girls and had continued to maintain a strong and loving relationship with them.

A hearing was set for November 5, 2013.

*Status Review Report*

DCFS reported that the social worker had visited father's home. It had two bedrooms, was clean, and was furnished. However, DCFS did not recommend overnight visits for the girls with father because he had not yet resolved the domestic violence issues of the family. He had four classes left to complete in the program, and the program had not yet provided any information about father's progress. Further, DCFS noted that father had not yet participated in any individual counseling.

Meanwhile, the girls remained in the nurturing and safe environment provided by Annie. The adoptive home study had been approved, and adoption was now the recommended permanent plan for both Melissa and Kaelyn, and legal guardianship continued to be the recommended plan for M.

*Continued Hearing*

On September 5, 2013, the juvenile court ordered DCFS to allow overnight visitation for father with the girls until the hearing on his section 388 petition. A

---

[2] The May 9, 2013, order was based on an attorney order submitted by the girls' attorney. The order was that DCFS "assess father's residence and has discretion to allow overnights at father's home."

9

contested section 366.26 hearing was set for the same date as the hearing on father's section 388 petition.

*DCFS's Response to Father's Third Section 388 Petition*

DCFS reported that M.[3] had changed her mind and now wanted to be adopted. She told the social worker that father was very argumentative, creating a hostile environment. She said that father did not give his attention to her, and instead concentrated on his girlfriend. It was apparent to M. that father had not changed and she wanted her situation finalized. She said that Annie provided her with a stable, loving, and safe home.

DCFS believed that father still had unresolved issues that affected his ability to safely parent the children. It noted that the July 15, 2010, minute order indicated that father was to participate in counseling and reported that the social worker had provided father with a copy of the minute order. According to DCFS, although father was aware of the need for counseling, he failed to comply with the court's order.

M. decreased the amount of contact with father because of an ongoing conflict and "not feeling secure while on visits with" him. She said that she wanted a resolution to her situation as "'this had gone on for a long time.'"

DCFS was now recommending termination of parental rights as to Melissa and Kaelyn and legal guardianship for M.

*Status Review Report*

DCFS reported that the girls wanted their case finalized because they were in a good home. They said it was not fair to them to prolong this matter.

---

[3]   In the respondent's brief, DCFS asserts that it is puzzling that "[M.]" had changed her mind and now wanted adoption and decreased her contact with father because on the next page of the DCFS report, DCFS indicated that M. wanted to reunite with father. DCFS suggests that the social worker mistakenly reported Kaelyn's wish for adoption, but mistakenly wrote M's name.

10

DCFS also reported that father failed to stay in contact with the social worker and that he had lost his apartment. Accordingly, he did not have any overnight visits with the girls, and the visits he did have with Kaelyn and M. were short and sporadic.

*Hearing on Father's Section 388 Petition and Section 366.26 Hearing*

At the March 21, 2014, hearing, the juvenile court received various reports and documents into evidence, including DCFS reports, father's section 388 petitions with attachments, and a certification of completion of father's 52-week domestic violence program. The girls' attorney indicated that Melissa and Kaelyn wanted to be adopted and M. wanted to proceed with legal guardianship. The girls' attorney also requested that the juvenile court deny father's section 388 petition.

Father's attorney acknowledged that father was not in a position to take custody of the girls, but asked that the juvenile court grant him additional reunification services with Kaelyn and M.

The juvenile court denied father's section 388 petition, noting that although father's circumstances may have been changing, any further delay would not promote stability and would not be in the best interests of the children.

Regarding the section 366.26 hearing, the girls' attorney noted that Melissa and Kaelyn were both over the age of 12 and both had consistently indicated that they wanted to be adopted. Their attorney submitted on the recommendation of legal guardianship for M.

Father submitted on the recommendation for legal guardianship for M., but his attorney argued that father had a relationship with Melissa and Kaelyn. According to counsel, his relationship with the girls was such that his parental rights should not be terminated.

The juvenile court began to make findings and orders consistent with the termination of parental rights for Melissa and Kaelyn. But, their attorney requested to go off the record. After a discussion off the record, the juvenile court continued the section 366.26 hearing.

*Supplemental Section 366.26 Report and Hearing*

On June 9, 2014, DCFS reported that Annie would be eligible for state-funded benefits for the girls under a plan of legal guardianship. Thus, DCFS now recommended legal guardianship for Melissa and M., but continued to recommend adoption for Kaelyn. That said, DCFS noted that Kaelyn was ambivalent and included legal guardianship paperwork just in case Kaelyn changed her mind.

At the hearing, the girls' attorney advised the juvenile court that Melissa and M. wanted to proceed with legal guardianship, but that Kaelyn wanted to proceed with adoption.

Kaelyn testified that the girls visited father whenever they had time and when she was not doing things. During the visits, they would go out to eat; sometimes, father would cook for them and help them with their homework. She said that she liked spending time with father.

She understood that adoption meant that her parents would not have the right to get her. She also understood that Melissa and M. were going to be under a permanent plan of legal guardianship and that it was possible that they could go back to father. She believed that she could also go back to father if she wanted to do so after she turned 18 years old. She stated that she would want to continue to live with Annie even if her sisters went back to father. She was aware that Annie would not be required to allow her to visit father if parental rights were terminated. She just wanted to be adopted. When asked why, Kaelyn stated, "'Cause I feel that that's what I want. I want—I don't want, like, to be under legal guardianship or anything. I just want, like, everything to be over." She was tired of going to court, missing school, and having a social worker visit every month.

The attorneys then argued the case. The girls' attorney submitted on the recommendation of legal guardianship for Melissa and M. She also submitted on Kaelyn's request for adoption, noting that Kaelyn was 12 years old, was aware of the differences between legal guardianship and adoption, and was aware of the consequences of adoption.

Father's attorney asked the juvenile court to find that the parental benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) existed. He did not argue that the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)) applied.

The juvenile court found that Kaelyn was adoptable and that no exception to adoption applied. Thus, it ordered her free from her parents' custody. It ordered legal guardianship for Melissa and M. and appointed Annie as their guardian. It then terminated jurisdiction over Melissa and M.

*Appeal*

Father's timely appeal ensued.

## DISCUSSION

I. *Termination of Parental Rights*

Father argues that the juvenile court erred in terminating his parental rights to Kaelyn because two exceptions to termination apply here: Parental benefit and sibling relationship. (§ 366.26, subds. (c)(1)(B)(i) & (v).)

A. <u>Standard of review</u>

"For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination [citations], although at least one court has concluded that it is properly reviewed for an abuse of discretion [citation]. Recently, the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling

13

reason for determining that termination would be detrimental to the child.' [Citations.] This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.) Like the courts in *Bailey J.* and *In re K.P.*, we apply the composite standard of review here.

B. Parental benefit exception

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child. When there is no probability of reunification with a parent, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies. (§ 366.26, subd. (c)(1); *In re Marina S.*, *supra*, at p. 164.)

To satisfy the parent-child exception to termination of parental rights in section 366.26, subdivision (c)(1)(B)(i), a parent must prove he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].) The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–

14

1419.) The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

A court may consider the relationship between a parent and a child in the context of a dependency setting, e.g., amount of visitation permitted, whether the parent was ever the child's primary caretaker. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537–1538.) But the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155–1156; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Father has not shown that the juvenile court in finding that this exception to the termination of parental rights applies. Regarding regular visitation, father initially kept in touch with Kaelyn and her sisters by writing them letters while he was incarcerated, had visited with the girls after he was released from custody, and had been granted unmonitored visits. But as of March 6, 2014, father's visits became short and sporadic. Even Kaelyn testified that she and her sisters only visited with father when they had time and when she was "doing nothing." While father asserts on appeal that DCFS thwarted his efforts at visitation, there is no evidence to support his assertion.

Additionally, father has failed to demonstrate that it would be detrimental to Kaelyn to terminate his parental rights. Kaelyn was born in February 2002; father was sent to state prison in February 2009 and not released until June 2012. Before that, he had been sentenced to jail time in 2002 and 2006. He never regained custody of Kaelyn, or even overnight visits, after his release, due in part to the fact that he was unable to provide her with appropriate housing. In contrast, Annie had provided day-to-day care

15

for Kaelyn for a significant portion of time; even Kaelyn recognized that Annie was committed to her, like a parent.

Importantly, Kaelyn, who was 12 years old at the time of the section 366.26 hearing, could have vetoed an order terminating father's parental rights. (§ 366.26, subd. (c)(1)(B)(ii).) However, she did not do so. Instead, she testified in open court in father's presence that she wanted to be adopted—even after her attorney advised her about the difference between legal guardianship and adoption and had advised her against adoption. Given the fact that she wanted to be adopted, even with the knowledge that Annie could prevent visits with father if his parental rights were terminated, we see no reason to find that she would suffer any detriment upon termination of parental rights.

C. Sibling relationship

For the first time on appeal, father argues that the sibling relationship exception precludes termination of parental rights. Because father did not raise this argument below, it has been forfeited on appeal. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 502; *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 641.) Our analysis could stop here.

For the sake of completeness, we note that this argument fails on the merits. Father's argument is completely speculative. While we applaud his desire to obtain permanent housing and provide a permanent home for his children, there is no evidence that he has yet to do so. Given the fact that Kaelyn is adoptable and wants to be adopted, coupled with her need for stability and the statutory preference for adoption (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799), we readily conclude that father has not demonstrated that the sibling relationship exception applies.

II. *Section 388 Petition*

Father contends that the juvenile court erred in denying his section 388 petition.

A. Applicable law

Section 388 provides, in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of

16

change of circumstances or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made." (See also *In re Brandon C.* (1993) 19 Cal.App.4th 1168, 1172; Cal. Rules of Court, rule 5.570(f).) "Section 388 provides the 'escape mechanism' . . . built into the process to allow the court to consider new information. [¶] . . . Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances . . . . [¶] . . . [T]he Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

That being said, "[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529; § 388, subd. (b).) Some factors which "provide a reasoned and principled basis on which to evaluate a section 388 motion" include "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F., supra,* at p. 532.)

"[T]he burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

"'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.'" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685; see also *In re Casey D., supra,* 70 Cal.App.4th at p. 47.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the

reviewing court has no authority to substitute its decision for that of the trial court.'"" (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.) Thus, we will not reverse a juvenile court's denial of a section 388 petition ""unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."" (*In re Stephanie M., supra,* at p. 318.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.)

  B. <u>The juvenile court rightly denied father's section 388 petition</u>

  Father claims that the juvenile court abused its discretion in denying his third section 388 petition because it based its decision on "fictitious evidence," namely that he was required to participate in individual counseling. We cannot agree. The juvenile court properly exercised its discretion when it denied father's section 388 petition on the grounds that the requested change was not in the best interests of the children. At the time of his third section 388 petition, father still was not in a position to take custody of the girls, let alone provide them with stability and permanence. While he argues that "that could have been ameliorated" had DCFS assisted him with housing, he offers no legal authority to support the proposition that the juvenile court committed reversible error by not providing father with housing.

  In short, father failed to demonstrate how reopening reunification services would have advanced the girls' best interests, namely their need for permanence and stability. It follows that we conclude that the juvenile court properly denied father's third section 388 petition.

**DISPOSITION**

The juvenile court's judgment and order are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
              ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.
      HOFFSTADT